Filed 11/29/23  Wolfson v. Gevorgian CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| SAMUEL WOLFSON et al. | B317054 |
| Plaintiffs and Respondents, | |
| v. | (Los Angeles County Super. Ct. No. 18VECV00094) |
| ALEXIS GEVORGIAN et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Huey P. Cotton, Judge.  Affirmed.

Law Office of Julie A. Herzog and Julie A. Herzog for Defendants and Appellants.

Luna & Glushon, Robert Leland Glushon, Sean M. Bryn; Ferguson Case Orr Patterson and John A. Hribar for Plaintiffs and Respondents.

_____

The poet Robert Frost observed that although good fences may make good neighbors, before building one might "ask to know What I was walling in or walling out, And to whom I was like to give offence." (Frost (1914) "The Mending Wall.") In this case, Samuel and Joyce Wolfson (the Wolfsons) claim their next-door neighbors, Alexis Gevorgian and Odet Najarian (the Gevorgians)[1] planted a row of Italian cypress trees near the boundary separating their respective homes not as good neighbors, but instead out of spite and to annoy the Wolfsons in retaliation for disagreements between the families. The Wolfsons filed suit against the Gevorgians, claiming the row of trees was a private nuisance and a spite fence under both state and municipal law. The trial court agreed and, after a bench trial, entered judgment requiring the Gevorgians to comply with the provisions of the Los Angeles Municipal Code (LAMC) establishing height limits for fences and hedges. The court also awarded the Wolfsons $60,000 in damages.

The Gevorgians challenge the trial court's spite fence finding, arguing that they were not motivated by spite, and that the trees are not a fence. The Gevorgians raise several additional contentions: that the Wolfsons lacked standing to bring a cause of action under the municipal code, that the suit was time-barred, that the Wolfsons are equitably estopped from bringing their claims, that the court erred by barring their expert witnesses from testifying, that the award of damages is excessive, and that the judgment is too vague to be enforceable. We reject all of these

---

[1] Najarian does not use her husband's last name, but we follow the practice of both parties in this case by referring to defendants jointly as the Gevorgians, and Alexis Gevorgian individually by his last name.

contentions, as we explain below, and affirm the trial court's judgment.

## FACTS AND PROCEEDINGS BELOW

In April 2002, the Wolfsons bought their home, located on a hillside lot in the Encino neighborhood of the City of Los Angeles with sweeping views in back of the San Fernando Valley. A few months later, the Gevorgians[2] bought the property located directly behind the Wolfsons. The Gevorgians' property is "landlocked," with no access to the street other than a 15-foot easement at the edge of the Wolfsons' land that the Gevorgians and the prior owners used as a driveway. In addition, the Gevorgians' home is located downhill from the Wolfsons. According to Gevorgian, the difference in elevation between the graded areas of the two homes is approximately 15 feet.

Soon after he and his wife purchased the property, Gevorgian met with the Wolfsons and told them he planned to demolish the home that then stood on the lot and build a new one. He asked the Wolfsons if they would expand the easement to include an additional corner of the Wolfsons' lot so that vehicles could turn on the Gevorgians' property more easily. The Wolfsons said they would consider the proposal, but requested consideration in exchange—a payment, along with a promise that the Gevorgians' new home would not disturb the Wolfsons' view, and that the workers building the new home would not make noise early on the weekends. Gevorgian refused these conditions and, according to the Wolfsons, told them that if they did not agree to expand the easement, he would build his new home in a

---

[2] The Gevorgians own the property through a living trust.

3

way that would block more of their view. Gevorgian described the situation differently. He claimed that expanding the easement was necessary to lower the elevation of his driveway, which in turn would have allowed him to build the new home at a lower elevation, thereby minimizing the impact on the Wolfsons' view.

The Gevorgians went forward with construction without the additional easement. As construction continued over the course of several years, the Gevorgians and the Wolfsons continued to come into conflict. In 2003, Gevorgian requested that the Wolfsons remove a pepper tree growing on the easement that, according to Gevorgian, was blocking him from using the easement. Alternatively, Gevorgian offered to remove and replant the tree himself if the Wolfsons gave him permission. According to the Wolfsons, they requested Gevorgian not remove the tree, but Gevorgian cut down the tree anyway. Gevorgian asserts he gave the Wolfsons advance notice that he planned to cut down the tree, and told them they could file for an injunction or restraining order if they wanted to prevent him. Gevorgian also claimed the easement was 18 feet wide, rather than 15 feet, and planned to pave the easement at that width. As construction on the new Gevorgian house continued, the Wolfsons were annoyed by the construction noise early in the morning on weekends. Gevorgian wrote, in an email to the Wolfsons, "you were once complaining about the fact that our construction equipment would be waking you up on Saturday. Now, this is the least of your concerns." Later in the same email, Gevorgian wrote, "Trust me when I say that you can and will make matters much worse for yourself if you continue to threaten me."

4

As the work was nearing completion in 2006, the Wolfsons grew concerned that the new home was blocking their view, and that its height exceeded the maximum allowed under the city's zoning laws. The Wolfsons hired a surveyor, who determined that the Gevorgians' home would exceed the 36-foot maximum height for homes in the area. When Gevorgian refused to address the issue with them directly, the Wolfsons filed a formal complaint with the Los Angeles Department of Building and Safety (LADBS), which ordered construction on the home to stop, delaying the project for several months and ultimately costing the Gevorgians at least $50,000. In 2006, the parties reached a cooperation agreement addressing the height of the Gevorgians' home, the construction of a wrought iron fence along the property line, and the paving of the easement.

The 2006 agreement led to a temporary reduction in the tensions between the families. This respite came to an end in 2008, when the Gevorgians planted Italian cypress trees in their yard. Of the 130 trees Gevorgian ordered, he planted approximately 40 close together in a row just inside the wrought iron fence that marked the property line between his home and the Wolfsons'. He planted many additional cypress trees along the border with another neighbor. At the time of planting, the trees were 10 to 20 feet high and were spaced less than three feet apart from one another.

Previously, in 2003, Gevorgian had offered to select two types of trees for landscaping, and to allow the Wolfsons to choose which of the two he planted. The Wolfsons believed the Gevorgians instead planted the hedge-like, fast-growing cypress trees in retaliation for the Wolfsons' complaint to the city regarding the height of the Gevorgians' house. Gevorgian denied

5

that he planted the trees out of spite, but instead claimed he chose the Italian cypress trees to complement the Tuscan architectural style of his home, to provide shade and privacy, and also because they do not shed leaves in the fall and are easy to maintain. The Wolfsons filed a complaint with the city, which in May 2008 issued an order directing the Gevorgians to reduce the height of the trees to a maximum of 42 inches. The parties disagree as to whether the city later dismissed the order, but the Gevorgians did not comply, and at some point, the city's enforcement efforts ceased.

In 2009, the families reached another agreement. This time, the Gevorgians agreed to allow the Wolfsons at their own expense to trim the cypress trees to a maximum height of approximately seven feet from ground level[3] every six months for up to 18 months. The parties agreed not to file complaints or lawsuits against one another, and to toll any claims or defenses against one another while the agreement was in place. The agreement would remain in effect for two years, but would automatically roll over indefinitely unless one side notified the other that it intended to terminate the agreement within 60 days of its expiration.

The trees were trimmed twice under this agreement, once in the summer of 2009 and again in early 2011. After the second trimming, Gevorgian complained that the Wolfsons' landscaper had entered onto his property to mark the trees for trimming and did so at the wrong time. He notified the Wolfsons that he

---

[3] The agreement provided a formula to allow for a uniform height, with the first 12 trees trimmed to six and one-half feet, and the rest to seven feet.

6

intended to terminate the agreement and wrote that if the Wolfsons wanted "to trim the trees in the future[, it] will be done as a neighborly accommodation in which I reserve all rights in my sole and absolute discretion."

In the years that followed, the families were unable to come to an agreement to have the trees trimmed. After terminating the prior agreement in early 2011, Gevorgian wrote to the Wolfsons that they should revisit the issue in six months. In November 2011, the Wolfsons' regular tree trimmers entered the Gevorgians' land and began trimming the cypress trees. The Wolfsons claim this happened inadvertently, but Gevorgian, who had not given permission, called the police.

By 2014, the trees had again grown tall enough to obstruct the Wolfsons' view, and the Wolfsons requested permission to trim them again. Gevorgian proposed the parties create a view easement to deal with the problem permanently, but he never pursued that idea further, and a few weeks later wrote an email to Joyce Wolfson stating, "You cannot trim," alleging that dirt runoff from the Wolfsons' yard was clogging his drains. Gevorgian again denied the Wolfsons permission to trim the trees in 2015. In 2017, Gevorgian agreed to allow the Wolfsons to trim the trees on the condition that they also remove dirt from his property. Gevorgian insisted that before the landscapers trimmed the trees, they mark them so that Gevorgian could see where they would be cut. Two days before the trimming was scheduled to take place, Gevorgian wrote to Samuel Wolfson that the trimmers "will not be able to mark and trim the same day as it is unlikely I will be here to approve it." According to Samuel Wolfson, the tree trimming company was unwilling to come to the house on two separate days to do the job. Negotiations over the

potential tree trimming continued in the succeeding months, but according to the Wolfsons, Gevorgian ultimately agreed to allow them to trim only the 12 northernmost trees.

The Wolfsons testified at the 2020 trial that the trees averaged 20 feet tall, with some as high as 30 feet, much taller than when they were last trimmed in 2011, and that from all the windows of their house, the primary view is of the trees. Gevorgian acknowledged that some of the trees have grown taller than the roof of his house, which is 30 feet. In addition to the row of trees immediately facing the Wolfsons' house, the Gevorgians also planted a row of cypress trees bordering the property to the south, which have grown to an average of 30 feet tall in 2020. According to Samuel Wolfson, these additional trees were tall enough to impact the view from his home. Because of the trees, the Wolfsons use their yard less often than they did in the past. Samuel Wolfson estimated the damages he suffered from the trees at $1,000 per week.

Joyce Wolfson works as a real estate broker, though she is not licensed as an appraiser. She testified that she believes her house would be worth at least $100,000 more if not for the trees, and that she has suffered $50,000 per year in damages, based on "the diminution of value and . . . that we had to sit through this and deal with it."

In October 2018, the Wolfsons filed a lawsuit against the Gevorgians alleging four causes of action, all based on the cypress trees: (1) private nuisance; (2) spite fence under state law (Civ. Code, § 841.4);[4] (3) spite fence under municipal law (LAMC,

---

[4] Unless otherwise specified, subsequent statutory references are to the Civil Code.

§ 41.30); and (4) violating municipal law on maximum fence height (LAMC, § 12.22C.20(f)).  The Wolfsons demanded an order requiring the Gevorgians to reduce the height of the trees, as well as compensatory and punitive damages and attorney fees.

While the case was pending, the Wolfsons filed another complaint against the Gevorgians with LADBS, which in May 2019 issued another order requiring the Gevorgians either to trim the trees to a maximum height of six feet, or to remove some of the trees to create at least three feet of separation between each tree.  The LADBS inspector later issued a noncompliance fee and prepared to send the case to the department's legal liaison for further enforcement, but the Gevorgians paid the outstanding fees in protest.  According to the inspector, a row of trees is deemed to be a hedge, and therefore subject to the municipal code's height limit for fences and hedges, if the trees are planted less than three feet apart, or if their leaves intermingle at any point below six feet in height.  The inspector testified that LADBS places a low priority on cases such as this one, and the department lacked resources to follow up and ensure compliance with its orders.  Orders to comply are appealable, but the inspector received no notification that the Gevorgians filed an appeal.  The inspector also did not know if the case had actually been forwarded to the city attorney.

After a bench trial, the trial court entered judgment in favor of the Wolfsons, awarding $50,000 in damages to Joyce and $10,000 in damages to Samuel Wolfson, and ordering the Gevorgians to "comply with the strict letter of [LAMC section] 12.22C.20(f)(1)-(3), without exemptions or exceptions, within 45 days of entry of [j]udgment."  The court filed a statement of decision explaining its finding that the row of trees is a spite

9

fence. The court wrote that, "The evidence presented at trial establishes that the Gevorgians are maintaining the trees on the shared property line in a manner to annoy, harass, frustrate, anger and retaliate against the Wolfsons for refusing to grant certain easements for the use of the Wolfson property that were demanded by [the Gevorgians] and for [the Wolfsons] making complaints to LADBS" (capitalization omitted). The court stated that the Gevorgians' explanation that they planted the trees for privacy and shade "is not credible for identifying the dominant purpose for the tree-wall."

## DISCUSSION

### A. Background on State and Municipal Law Regarding Spite Fences

The Wolfsons accused the Gevorgians of maintaining a spite fence under both state and municipal law. We begin by discussing the background of these laws.

#### 1. *State Law*

The court in *Wilson v. Handley* (2002) 97 Cal.App.4th 1301 (*Wilson*) provided a useful history of the California spite fence statute. In the 19th century, American common law rejected "the English doctrine of 'ancient lights,' under which a landowner could acquire an easement over adjoining property for the passage of light and air." (*Id.* at p. 1307.) The theory in the United States was that " 'society had a significant interest in encouraging unrestricted land development. Moreover a landowner's rights to use his land were virtually unlimited . . . . In contrast, light had little social importance beyond its value for aesthetic enjoyment or illumination.' [Citation.]" (*Ibid.*) This led to abuses, as in one anecdote involving railroad baron Charles

10

Crocker in the 1870s. "Crocker sought to purchase an entire city block on San Francisco's Nob Hill on which to build a mansion, and [when] a local undertaker named [Nicholas] Yung would not sell his small lot to Crocker, Crocker bought the remainder of the block and built a fence 40 feet high on his property around Yung's lot. [Citation.] Eventually, Yung sold out and Crocker procured the entire block."[5] (*Ibid.*)

Beginning in the late 19th century, jurisdictions began enacting spite fence statutes declaring unnecessarily high fences built to spite one's neighbor to be private nuisances. (*Wilson*, *supra*, 97 Cal.App.4th at p. 1308.) California's spite fence statute was enacted in 1912, was codified as section 841.4 in 1953 (Stats.1953, ch. 37, § 2), and has not been amended since. Section 841.4 defines a spite fence as "[a]ny fence or other structure in the nature of a fence unnecessarily exceeding 10 feet in height maliciously erected or maintained for the purpose of annoying the owner or occupant of adjoining property." Under the statute, a spite fence "is a private nuisance," and an "owner or occupant of adjoining property injured either in his comfort or

---

[5] The *Wilson* court's account elided the end of this story. The spite fence outlasted both Yung and Crocker, who died in 1880 and 1888, respectively. Yung's children finally sold the lot in 1904, at which point Crocker's children tore down the fence. (https://www.kqed.org/news/10449405/boomtown-memories-the-nob-hill-fence-that-spite-built [as of Nov. 21, 2023].) The Crocker mansion commanded its entire block for just two more years, at which point one might say karma struck and the mansion burned down in the great San Francisco earthquake. Crocker's family later donated the land to the Episcopal Church, which built Grace Cathedral on the site. (https://gracecathedral.org/history/ [as of Nov. 21, 2023].)

11

the enjoyment of his estate by such nuisance may enforce the [same] remedies" applicable to any other private nuisance. (*Ibid.*) These include bringing a civil action, or, in appropriate circumstances, employing self-help. (§§ 3501-3503.)

Two published California cases have held that a row of trees can constitute a "structure in the nature of a fence" (§ 841.4) for purposes of the spite fence statute. (See *Vanderpol v. Starr* (2011) 194 Cal.App.4th 385, 393–394; *Wilson*, *supra*, 97 Cal.App.4th at pp. 1306–1309.) The court in *Wilson* analyzed the issue in detail. First, the court noted that it was "bound by the rule of liberal construction that applies to the Civil Code." (*Wilson*, *supra*, at p. 1306.) Under either a broad definition of the word structure as " 'something arranged in a definite pattern of organization' " (*ibid.*, quoting Webster's Collegiate Dict. (10th ed. 2000) p. 1163, col. 2), or a narrower definition as " 'something constructed or built' " (*ibid.*, quoting Webster's New Internat. Dict. (2d. ed. 1938) p. 2501, col. 1), the court reasoned that a row of trees can be a structure because "any enterprising individual with a shovel and some saplings can construct a *row* of trees by simply planting the saplings in their proper place and order." (*Wilson*, *supra*, at p. 1307.)

The *Wilson* court further concluded that a row of trees can have "the nature of a fence" (§ 841.4) for purposes of the statute, reasoning that "spite fence statutes were enacted to prevent what would otherwise be the lawful practice of a landowner erecting or maintaining an unnecessarily high barrier between his or her property and an adjoining property to annoy the neighboring landowner." (*Wilson*, *supra*, 97 Cal.App.4th at p. 1309.) A row of trees can indeed annoy one's neighbor, even if it does not "prevent intrusion from without or straying from within" as an

12

ordinary fence would.  (*Ibid.*)  The court in *Vanderpol* agreed with the *Wilson* court's conclusion, noting that "If the rule were otherwise, we potentially would be creating an exception to the statute that could swallow the rule" because a row of trees can block a neighbor's light and air as easily as a fence.  (*Vanderpol v. Starr, supra*, 194 Cal.App.4th at p. 394.)  Indeed, trees can be a more effective tool to spite one's neighbor because "unlike a fence, trees grow and certain trees can grow very quickly."  (*Ibid.*)

Although courts have accepted a broad definition of "fence" when interpreting the spite fence statute, they have more strictly applied the requirement that the defendant be motivated by spite.  In *Wilson*, the court "adopt[ed] the 'dominant purpose' test for determining whether the 'malice' element of section 841.4 has been satisfied."  (*Wilson, supra*, 97 Cal.App.4th at p. 1313.)  This test originated in a 19th century Massachusetts case interpreting the nation's first spite fence statute.  To violate that statute, " 'The fences must be "maliciously erected, or maintained for the purpose of annoying" adjoining owners or occupiers.  This language clearly expresses that there must be an actual malevolent motive, as distinguished from merely technical malice. . . .  [W]e are of opinion that it is not enough to satisfy the words of the act that malevolence was one of the motives, but that malevolence must be the dominant motive,—a motive without which the fence would not have been built or maintained.  A man cannot be punished for malevolently maintaining a fence for the purpose of annoying his neighbor merely because he feels pleasure at the thought he is giving annoyance, if that pleasure alone would not induce him to maintain it, or if he would maintain it for other reasons, even if that pleasure should be denied him.' "  (*Wilson, supra*, at p. 1312, quoting *Rideout v. Knox*

13

(1889) 148 Mass. 368 [19 N.E. 390, 392].)  A strict understanding of the malice requirement also finds support in *Bar Due v. Cox* (1920) 47 Cal.App. 713, the first case to interpret the California spite fence statute.  The court held that the malicious motive was necessary to render the law constitutional, and cited *Rideout* for support.  (*Bar Due*, *supra*, at p. 716.)

    2.    *The LAMC*

As part of its zoning code, the LAMC regulates the height of fences in residential areas.  Section 12.22C.20(f) of the LAMC allows owners homes in a hillside area to build "a fence or wall not more than six feet in height" in their yard.[6]  (*Id.*, § 12.22C.20(f)(2), (f)(3).)  The height may be increased to eight feet with the authorization of a zoning administrator.  The code provides that "the terms 'fence' and 'wall' shall include latticework, ornamental fences, screen walls, hedges or thick growths of shrubs or trees.  Fence and wall height shall be measured from the natural ground level adjacent thereto." (LAMC, § 12.22C.20(f)(1).)

Separate from these regulations, the municipal code includes its own spite fence statute, which states that "No person shall maliciously construct, erect, build, plant, cultivate or maintain any fence or wall or any hedge or similar growth unnecessarily exceeding six . . . feet in height, for the purpose of annoying the owners or occupants of adjoining property." (LAMC, § 41.30.)

---

[6] The municipal code distinguishes between front yards and side or rear yards, but the fence height limits are the same for the Gevorgians' property for all categories of yards.  (See LAMC, § 12.22C.20(f)(2), (f)(3).)

14

**B.    The Wolfsons Had Standing to Allege Violations of the LAMC**

The Gevorgians contend that the Wolfsons lack standing to bring the third and fourth causes of action, which allege violations of the LAMC.

Before we address the merits of this issue, we must consider the Wolfsons' claim that the Gevorgians forfeited the issue by failing to ask the trial court to dismiss the third and fourth causes of action for lack of standing.[7]  Although it is true that " ' "As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal" ' " (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 548), that rule does not apply here because "the issue of standing can be raised at any time, including for the first time on appeal." (*Save Agoura Cornell Knoll v. City of Agoura Hills* (2020) 46 Cal.App.5th 665, 681.)  A lack of standing is a jurisdictional defect that cannot be waived.  " ' "[A] complaint by a party lacking standing fails to state a cause of action by the particular named plaintiff, inasmuch as the claim belongs to somebody else. [Citation.]  A more accurately stated rationale would be that there is a defect in the parties, since the party named as plaintiff is not the real party in interest." ' " (*Cummings v. Stanley* (2009) 177 Cal.App.4th 493, 501.)  It may have been preferable for the Gevorgians to have filed a demurrer asserting a lack of standing at the outset of the case, but failing to do so did not waive the question of standing.

---

[7] The Gevorgians appear to have raised the issue of standing for the first time in their proposed statement of decision at the end of trial.

15

Although the Gevorgians' argument on standing is not waived, it nevertheless fails on the merits. The Gevorgians are correct that "citizens of a municipality ordinarily have limited standing to enjoin violations of a municipal ordinance, absent authorization in the ordinance itself." (*Major v. Silna* (2005) 134 Cal.App.4th 1485, 1498.) But there is an exception to this rule "when the violations work a special injury on the citizen." (*Id.* at pp. 1498–1499.) This exception applies to alleged zoning violations. (*Pacifica Homeowners' Assn. v. Wesley Palms Retirement Community* (1986) 178 Cal.App.3d 1147, 1152–1153.) This exception squarely applies here, as the alleged violations of the LAMC constituted a nuisance that inflicted a special injury on the Wolfsons.

In support of their argument that the Wolfsons lack standing, the Gevorgians rely on *Mendez v. Rancho Valencia Resort Partners, LLC* (2016) 3 Cal.App.5th 248, where the court rejected an effort by plaintiff homeowners to obtain an injunction to bar a neighboring resort from hosting loud outdoor events on its property. In reaching that conclusion, the court recognized the exception we noted above. It stated that "a zoning violation *cannot* be enjoined by a private individual in the absence of proof that the violation also constitutes a private nuisance, has caused the individual special damages of a kind different from the general public, or that the ordinance was enacted to protect the particular welfare of a community of which the private individual is a member." (*Id.* at p. 268.) The court did not hold that the plaintiffs lacked standing, but rather affirmed the trial court's judgment against them after a bench trial because the plaintiffs failed to show that the defendant's violation of municipal law constituted a private nuisance. (*Id.* at pp. 269–270.)

16

**C.** **The Statute of Limitations Does Not Bar the Wolfsons' Claims, Nor Are the Wolfsons Equitably Estopped from Asserting Their Claims**

The Gevorgians contend the Wolfsons' claims were time-barred. The statute of limitations for an injury to real property is three years. (Code Civ. Proc., § 338, subd. (b).) The Gevorgians argue that the Wolfsons' claim accrued in 2008, when the trees were first planted. In the Gevorgians' view, it was then tolled for two years under the terms of the 2009 agreement, but then began to run again when Gevorgian terminated the 2009 agreement and expired at some point in 2013 or 2014, long before the Wolfsons filed suit in 2018.

A three-year statute of limitations indeed applies to private nuisance claims, but its application depends on whether the nuisance is permanent or continuing. (*Madani v. Rabinowitz* (2020) 45 Cal.App.5th 602, 607.) If a nuisance is permanent, " 'the statute of limitations begins to run on the creation of the nuisance and bars all claims after its passage . . . .' [Citation.] By contrast, 'each repetition of a continuing nuisance is considered a separate wrong which commences a new period in which to bring an action for recovery based upon the new injury. [Citation.]' [Citation.] Thus, if a trespass or nuisance is continuing, ' "an action may be brought at any time to recover the damages which have accrued within the statutory period, although the original trespass occurred before that period." ' [Citation.]" (*Id.* at p. 608.)

In determining whether a nuisance is permanent or continuing for purposes of the statute of limitations, the key question " 'is whether the . . . nuisance can be discontinued or abated.' " (*Mangini v. Aerojet-General Corp.* (1996) 12 Cal.4th

17

1087, 1097.) In our Supreme Court's formulation, a nuisance can be abated if it "can be remedied at a reasonable cost by reasonable means." (*Id.* at p. 1103.) Thus, an encroaching fence was a continuing, not a permanent, trespass, where the defendant testified it would cost $5,000 to $6,000 to move the fence off of the plaintiff's property. (*Madani v. Rabinowitz, supra*, 45 Cal.App.5th at p. 609.) And, more directly relevant to this case, in a case where the plaintiffs sought on the basis of a San Francisco ordinance to remove a tree that blocked their view, the court held that the nuisance was abatable. (*Kahn v. Price* (2021) 69 Cal.App.5th 223, 238.)

The Gevorgians do not claim that the trees were a permanent condition under this standard. Instead, they argue that the tolling provision in the 2009 agreement between the parties supersedes the continuing nuisance doctrine. In the 2009 agreement, the parties agreed "to toll all statute[s] of limitations and other time defenses that might be applicable to any and all claims, actions, demands, losses or liabilities of each other" while the agreement remained in effect. But as we noted above, " 'each repetition of a continuing nuisance is considered a separate wrong which commences a new period in which to bring an action for recovery based upon the new injury. [Citation.]' [Citation.]" (*Madani v. Rabinowitz, supra*, 45 Cal.App.5th at p. 608.) We do not see how the Wolfsons' 2009 agreement to toll their existing claims prevented them from filing suit based on causes of action that, under the continuing nuisance doctrine, are deemed to have accrued years later, after the Gevorgians terminated the agreement.

The Gevorgians also argue that the 2009 agreement equitably estops the Wolfsons from claiming that the trees are a

18

spite fence.  We find this claim equally unpersuasive.  The 2009 agreement was designed to resolve the dispute over the trees, and if it had remained in effect to the present, the Gevorgians might legitimately point to the agreement as the final resolution of the dispute, barring the Wolfsons from bringing the present case.  But Gevorgian terminated the agreement in 2011, and the trees continued growing.  Nothing in the agreement itself suggests that it would continue to prevent the Wolfsons from bringing legal action after its termination, and we do not understand how the Gevorgians could have reasonably believed the agreement continued to protect them after they elected to terminate it.

D.    **A Spite Fence Need Not Be Located Precisely on a Boundary Line**

The Gevorgians contend that the row of cypress trees cannot be a spite fence because the trees are not located on the boundary between their land and the Wolfsons'.  Instead, a wrought-iron fence marks the boundary.

But a spite fence need not be located precisely on the boundary between two properties.  The court held in *Wilson* that "a row of trees planted on *or near* the boundary line between adjoining parcels of land can" constitute a spite fence.[8]  (*Wilson, supra*, 97 Cal.App.4th at p. 1309, italics added.)  We are aware of no case law to the contrary, and for obvious reasons.  If the spite fence statute applied only to fences built exactly on a property boundary, a landowner could defeat the intent of the statute simply by building a fence inches away from the line.

---

[8] The Gevorgians cite this passage from *Wilson* in this section of their opening brief, but they blithely ignore the crucial phrase "or near" when making their argument.

In this case, the cypress trees were apparently close enough to the property line that, in a 2009 email, Gevorgian asked the Wolfsons if a landscaper could trim the cypress trees "from [the Wolfsons'] side" of the property line, and Samuel Wolfson replied that his "landscaper advises that he can trim the cypress [trees] from our side of the fence."

## E.    A Spite Fence Need Not Offend the Senses

The Gevorgians argue that the cypress trees do not meet the definition of a nuisance under California law, in that they are not "injurious to health, . . . indecent or offensive to the senses, or an obstruction to the free use of property." (§ 3479.)  Cases have held that "a building or structure may not be complained of as a nuisance merely because it interferes with the passage of light and air to adjoining premises." (*Venuto v. Owens-Corning Fiberglas Corp.* (1971) 22 Cal.App.3d 116, 127.)

The problem with this argument is that the Gevorgians base it upon law pertaining to nuisances in general, not the spite fence statute.  As the court explained in rejecting a similar argument in *Wilson*, "It might be true that, absent the spite fence statute, a fence that interfered only with light and air would not be a nuisance under the general definition of a 'nuisance' in . . . section 3479.  [Citation.]  That does not mean, however, that a fence which violates the spite fence statute must interfere with something more than light and air to be a nuisance under *that* statute.  Section 841.4 specifically provides that a fence or other structure in the nature of the fence that meets certain requirements 'is a private nuisance.'  Section 841.4 does not specify that the fence must interfere with something more than light and air to be a nuisance, and we are not at liberty to read any such additional requirement into the statute." (*Wilson*,

20

*supra*, 97 Cal.App.4th at pp. 1310–1311, fn. omitted.) Indeed, the history of the spite fence statute described earlier in this opinion suggests that the statutory purpose is to protect access to light and air.

## F. The Trial Court Did Not Err in Relying on the LADBS Definition of "Hedge"

The Gevorgians contend the trial court misinterpreted the LAMC rules on fence and hedge height by relying on an LADBS manual for its definition of the term hedge. According to the Gevorgians, the LADBS manual, which defines a row of trees planted less than three feet apart or with leaves intermingling below six feet as a hedge, is not authoritative and is based on an outdated version of the municipal code.

We are not persuaded. The Gevorgians are correct that although the municipal code restricts the height of hedges, it does not define the term hedge. " 'When a term goes undefined in a statute, we give the term its ordinary meaning.' " (*Environmental Health Advocates, Inc. v. Sream, Inc.* (2022) 83 Cal.App.5th 721, 730, quoting *Taniguchi v. Kan Pacific Saipan, Ltd.* (2012) 566 U.S. 560, 566 [132 S.Ct. 1997, 182 L.Ed.2d 903].) The Gevorgians propose the following definition for hedge: " 'a fence or a boundary formed by a dense row of shrubs or trees to act as a fence.' "[9] That definition is of little help, in that it does not specify how densely planted a row of trees must be to

---

[9] The Gevorgians cite Webster's Dictionary as the source of this definition, but they cite no specific edition. We find a similar definition in the online version of the Merriam-Webster dictionary: "a fence or boundary formed by a dense row of shrubs or low trees." (https://www.merriam-webster.com/dictionary/hedge, def. 1.a [as of Nov. 21, 2023].)

21

constitute a hedge. The Wolfsons offered the LADBS standard, which, although not authoritative, has apparently guided the LADBS in deciding this issue for decades. The Gevorgians could have presented the court with an alternative standard under which the row of cypress trees did not constitute a hedge, but they failed to do so. The trial court did not err in relying on the only available standard presented to it for deciding what constitutes a hedge under the LAMC.

## G.    Substantial Evidence Supported the Trial Court's Factual Findings

The Gevorgians argue that, although the cypress trees were more than 10 feet tall, they are not a spite fence because they do not "unnecessarily exceed[ ]" that height limit. (§ 841.4.) They also argue that the trial court erred by finding the trees were "maliciously erected or maintained for the purpose of annoying the" Wolfsons (*ibid.*) because even if the Gevorgians were partly motivated by malice, that was not "the dominant purpose" (*Wilson*, *supra*, 97 Cal.App.4th at p. 1313) for planting and maintaining the trees.

Although these arguments are framed differently, they are closely related. The Gevorgians argue that malice was not their dominant purpose in planting and maintaining the cypress trees, but rather that they chose the trees because they were easy to maintain and provided shade and privacy from the Wolfsons. They argue the trees needed to be taller than 10 feet for the same reasons. Regardless of how this is framed, it is primarily a

22

factual question—what was the Gevorgians' primary motivation for planting the trees?[10]

We review the trial court's factfinding in a bench trial for substantial evidence. "This traditional standard of review is highly deferential. It has three pillars. First, we accept all evidence supporting the trial court's order. Second, we completely disregard contrary evidence. Third, we draw all reasonable inferences to affirm the trial court. These three pillars support the lintel: We do not reweigh the evidence." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581.)

The trial court heard testimony from Gevorgian regarding his motivation for planting the cypress trees but found his testimony "not credible for identifying the dominant purpose for the tree-wall." The court's conclusion is amply supported in the record. The Wolfsons introduced multiple emails from Gevorgian in which he warned he would retaliate against them if they did not comply with his wishes. In one email from 2003, just one year after he bought the property, Gevorgian wrote that if the Wolfsons did not accept what he offered them, they would "los[e] more and more," and if they "continue to try to take what is not yours, this pattern will continue to a point in which you will lose

---

[10] The Gevorgians also challenge the trial court's factual findings on a third ground. They argue that the Wolfsons' nuisance claim fails because "[t]here were no pictures admitted into evidence showing blockages from the rear-view windows or from vantage points in the backyard." But Samuel Wolfson testified that, as of 2020, the trees were visible from all the windows of the house and were "one of the predominant features of our backyard." This was sufficient. There was no requirement to introduce photographs to corroborate this testimony.

23

opportunity for any agreement." Later he wrote, "Trust me when I say that you can and will make matters much worse for yourself if you continue to threaten me." The trial court could reasonably conclude from such statements that when the Wolfsons filed a complaint with the LADBS and delayed construction on Gevorgian's house, he retaliated by planting the cypress trees with the primary purpose of ruining the Wolfsons' view.

Other evidence also called into question the sincerity of Gevorgian's professed motivations for planting the trees. He claimed he needed the cypress trees for privacy, but Samuel Wolfson testified that even without the trees, the Gevorgian house was not visible from the main level of the Wolfsons' home. He could see the Gevorgians' home clearly only if he climbed down to a rarely visited lower level of the back yard. Many of Gevorgian's complaints about the Wolfsons were pretextual. Gevorgian claimed he needed the cypress trees because of teenagers partying at the Wolfson house, but the Wolfsons' youngest child was 35 years old in 2020. Gevorgian complained in a 2017 email about a telescope on the Wolfsons' balcony, but Samuel Wolfson testified that he and his wife had removed the telescope a decade earlier at Gevorgian's request. "[I]n a bench trial, the trial court is the 'sole judge' of witness credibility" (*Schmidt v. Superior Court*, *supra*, 44 Cal.App.5th at p. 582), and there is no reason to depart from that principle in this case.

## H. The Court Did Not Abuse its Discretion in Barring Testimony from the Gevorgians' Expert Witnesses

The Gevorgians sought to introduce testimony from two expert witnesses regarding LADBS procedures, but the trial court barred them from testifying on the ground that their testimony would be irrelevant. The Gevorgians allege this was

24

error.  "[W]e review [the trial court's] ruling excluding or admitting expert testimony for abuse of discretion" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773), and we conclude that the trial court did not exceed the scope of its discretion.

The Gevorgians' first expert witness was Thomas Ysasi, a construction consultant who frequently dealt with the LADBS, including on orders to comply and applying for variances and modifications.  Ysasi acknowledged, however, that he had no experience with the municipal code provisions on trees and hedges.  The trial court barred Ysasi from testifying as an expert regarding the variance process because "he's not qualified to do that" and "It's not relevant."

The second expert witness was Eric Lieberman, whom the Gevorgians' attorney described as an "expediter" in dealing with the LADBS.  Lieberman stated that he had worked for years obtaining variations and modifications from the LADBS to allow projects to move forward, including some instances where the rules regarding fences and hedges were at issue, and many instances where his clients had to challenge an order to comply. The court expressed skepticism as to whether Lieberman could offer relevant testimony but allowed him to begin testifying subject to a motion to strike.  Lieberman testified briefly about his view of the intent of the LAMC, after which the trial court struck the testimony.

The Gevorgians argue the trial court erred by barring the expert testimony because the experts could have testified about the city's appeal and variance process, under which the Gevorgians could have sought to contest the city's order to comply.  This misunderstands the nature of the proceeding,

which was not an enforcement action brought by the city. The primary question in this case was whether the cypress trees were a private nuisance. The Wolfsons were able to bring causes of action under the LAMC because, as we noted above (see Discussion, Part C, *ante*), they alleged that the Gevorgians' violations of the municipal code "work[ed] a special injury on" them. (*Major v. Silna*, *supra*, 134 Cal.App.4th at pp. 1498–1499.) As part of its inquiry, the court needed to determine whether the Gevorgians' trees indeed violated the relevant provisions of the municipal code, and if the Gevorgians had sought to obtain expert testimony on the question of whether the trees were a hedge or produced a hedge-like effect, it may have been admissible. But that was not the expert testimony they offered.

Furthermore, even if the decision to bar the experts from testifying constituted error, it would not require reversal because the exclusion would have made no difference in the outcome of the case. (*Ajaxo, Inc. v. E\*Trade Financial Corp.* (2020) 48 Cal.App.5th 129, 185 ["A judgment of the trial court may not be reversed for the erroneous admission or exclusion of evidence unless the error was prejudicial, resulting in a miscarriage of justice"].) The Wolfsons alleged that the Gevorgians' trees violated not only the municipal code height restrictions, but also its spite fence statute. That statute (LAMC, § 41.30) bars malicious fences and hedges above six feet tall, with no apparent allowance for variances or exceptions. The Gevorgians' experts professed no experience with that statute, which would have required the same result in this case—to remove or trim the trees in order to abate the nuisance.

26

## I. There Was Sufficient Evidence Supporting the Award of Damages

The Gevorgians contend that no evidence supported the trial court's award of $50,000 in damages to Joyce Wolfson, and $10,000 to Samuel Wolfson. We review a trial court's award of damages after a bench trial for substantial evidence (see *Cameron v. Las Orchidias Properties, LLC* (2022) 82 Cal.App.5th 481, 519), the same standard we described above (see Discussion, Part F, *ante*). Under this standard, we affirm.

"Damages recoverable in a successful nuisance action for injuries to real property include not only diminution in market value but also damages for annoyance, inconvenience, and discomfort [citation]; actual injuries to the land [citation]; and costs of minimizing future damages. [Citation.]" (*City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 464.) Both Wolfsons testified that the presence of the spite fence caused them to use their backyard less often than they otherwise would have, and that they find the view of the trees stressful and unpleasant. Both estimated their total damages from the spite fence at $50,000 per year.

The Wolfsons' estimate of the damages they suffered was not tethered to any financial data, but this is the nature of noneconomic damages. " ' " 'No method is available to the [trier of fact] by which it can objectively evaluate such damages, and no witness may express his subjective opinion on the matter. [Citation.] In a very real sense, the [trier of fact] is asked to evaluate in terms of money a detriment for which monetary compensation cannot be ascertained with any demonstrable accuracy.' " [Citations.]' [Citation.]" (*Cameron v. Las Orchidias Properties, LLC*, *supra*, 82 Cal.App.5th at p. 519.) The lack of a

27

precise method of calculation does not mean that damages are unavailable, and in this case, the trial court's estimate was not unreasonable given the Wolfsons' testimony.

The Gevorgians also argue that the trial court erred by allowing Joyce Wolfson to offer her opinion as to the diminution of the value of her property as a result of the Gevorgians' trees. Joyce Wolfson testified that she was a real estate broker, but she did not claim to be an appraiser, and she offered no basis for her opinion that her home was worth $100,000 less than it would have been if not for the Gevorgians' trees other than her experience as a real estate broker. A property owner may testify as to the value of her property (Evid. Code, § 813), but "is bound by the same rules of admissibility as any other witness regarding the value of real property." (*Jones v. Wachovia Bank* (2014) 230 Cal.App.4th 935, 950–951.) In particular, an opinion on the value of property must be "based on matter perceived by or personally known to the witness or made known to the witness at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion as to the value of property." (Evid. Code, § 814.)

As with any other purported error involving the admission of evidence, however, an error in admitting improper testimony on valuation is reversible only if prejudicial. (*Ajaxo, Inc. v. E*Trade Financial Corp.*, *supra*, 48 Cal.App.5th at p. 185.) In this case, any error was harmless because the statement of decision shows the trial court did not rely on Joyce Wolfson's estimate of diminution in value as a basis for awarding damages. In their proposed statement of decision, the Wolfsons requested $125,000 each in damages. The trial court awarded them less than 25 percent of that amount, with Samuel Wolfson receiving

28

$10,000 and Joyce $50,000.  The court stated that its award was based on the Wolfsons' "loss of use and enjoyment of [their] property as well as damages to Joyce . . . Wolfson for emotional distress" (capitalization omitted).  Thus, the trial court's award was attributable to noneconomic factors and was not based on the diminution in value of the Wolfsons' home.  There is no reasonable probability that the amount of the damages award would have changed if Joyce Wolfson had not been allowed to offer her opinion as to the loss in her home's value.

## J.  The Judgment's Injunctive Provision Is Not Impermissibly Vague

As part of the judgment, the trial court issued a mandatory injunction ordering the Gevorgians "at their sole cost, [to] comply with the strict letter of [LAMC section] 12.22C.20(f)(1)-(3), without exemptions or exceptions, within 45 days of entry of Judgment."

The Gevorgians contend that the injunction is too vague to be enforced, in that it leaves several questions unanswered that are necessary for them to comply with the injunction: "1.) how to determine the grade elevations as this site . . . slopes and what does 'adjacent' mean? 2.) how far apart can the trees be and does that include the tree stump, the leaves, and what if the leaves are trimmed and they grow back? 3.) is the wrought iron fence considered the fence or are the trees considered the fence as the intent of the ordinance is to not have a tall fence 4.) what is the definition of a 'hedge' or 'hedge effect' and 5.) how do you define a front yard versus side yard[?]"

We are not persuaded that these alleged issues render the trial court's injunction so ambiguous that the Gevorgians cannot "determine from the order what [they] may and may not do."

29

(*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 534.) Given that the injunction simply mandates compliance with certain provisions of the LAMC, plaintiffs in effect are challenging those municipal code provisions as unconstitutionally void for vagueness. We do not find the LAMC provisions at issue impermissibly vague, as plaintiffs fail to overcome the "strong presumption that statutes must be upheld unless their unconstitutionality is clear, positive, and unmistakable." (*Ivory Education Institute v. Department of Fish & Wildlife* (2018) 28 Cal.App.5th 975, 981.)

In any event, the trial court addressed most of the Gevorgians' concerns in its statement of decision. First, the record demonstrates that the court's order pertained to the trees, not the wrought iron fence behind them. Next, the trial court implicitly accepted the LADBS inspectors' interpretation that a row of trees planted less than three feet apart or with leaves touching below six feet constitutes a hedge. To the best of our knowledge, the Gevorgians have never suggested or advocated for an alternative definition. The question of what constitutes a front or side yard is immaterial because under the relevant provisions of the LAMC, the fence or hedge height requirements are the same regardless. The question of how to measure the height of the trees is of little consequence, as the LAMC provisions referenced in the injunction make clear they are to be "measured from the natural ground level adjacent thereto." (LAMC § 12.22C.20(f)(1).) Finally, the injunction creates a continuing duty to comply with the LAMC. If the trees grow back after they are trimmed so that they are no longer in compliance, the Gevorgians must trim them again.

The Gevorgians lastly complain that the trial court's direction that they comply with the LAMC height requirements "without exemptions or exceptions" deprives them of their right to seek a variance from the LADBS, or to appeal the LADBS's decision. Again, the Gevorgians have mistaken the nature of this proceeding, in which the LADBS was not a party. The court's function here was to determine whether the Gevorgians' cypress trees were a private nuisance, and having done so, to craft the appropriate remedy for that nuisance. The fact that the trial court referred to the LAMC in crafting injunctive relief does not mean that the Gevorgians were entitled to the ordinary LADBS procedures for seeking a variance or appeal from the trial court's decision.

## DISPOSITION

The judgment of the trial court is affirmed. The Wolfsons are awarded their costs on appeal.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

CHANEY, J.

BENDIX, Acting P. J.

31